UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

M.L., by his parents, Y.L. and C.L.,

                Plaintiffs,

        - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.
-----------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
13-CV-2314 (RRM) (LB)

ROSLYNN R. MAUSKOPF, United States District Judge.

       Parents Y.L. and C.L. bring this *pro se* action on behalf of their child, M.L., against the

New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking modified *de novo* review and

reversal of the State Review Officer's ("SRO") affirmation that the parents were not entitled to

reimbursement or direct payment for either their unilateral placement of M.L. into a private

school, or for additional services.

       For the reasons that follow, and after reviewing the administrative record under the

modified *de novo* review standard, the Court finds that the DOE offered M.L. a Free Appropriate

Public Education ("FAPE"). Accordingly, the SRO's decision is affirmed, plaintiffs' motion for

summary judgment is denied, and the DOE's cross-motion for summary judgment is granted.

# BACKGROUND

The SRO's findings of fact are due appropriate deference by the Court, as further explained below, which is not an expert on education or childhood learning disabilities, and which relies upon the administrative record as the basis for its opinion. *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006). The Court, therefore, adopts the SRO's findings of fact as its own unless otherwise noted. *See id.* (adopting SRO's well-articulated factual findings). For ease of reference, however, the facts relevant to the instant determination are restated in summary fashion as follows.

## I.    M.L.

M.L. began receiving special education itinerant teacher ("SEIT") services at the age of two, and at three was diagnosed with "pervasive developmental disorder – not otherwise specified," one of the three autism spectrum disorders.[1] (*See* Comprehensive Psychological Evaluation (Doc. No. 37-4 at 3)[2] at 1.) He attended a special education preschool where he received applied behavior analysis ("ABA") with additional SEIT services and residential habilitation services. (SRO Decision (Doc. No. 36) at 2.) By age seven, M.L. had also been diagnosed with Attention Deficit Hyperactivity Disorder. (*See* Student Progress Report for Annual Review (Doc. No. 37-4 at 13) at 1.)

M.L. attended first and second grade at the Ha'or Beacon School ("Beacon") during the 2010–2011 and 2011–2012 school years. Beacon is a special education school for Jewish Orthodox boys, where religious instruction, led by a rabbi, constitutes a significant portion of the

---

[1] *See* Chris Plauché Johnson et al., *Identification and Evaluation of Children with Autism Spectrum Disorders*, 120 *Pediatrics* 1183, 1184 (November 2007), *available at* http://dls.virginia.gov/commissions/aac/files/AAP_Autism_ID.pdf (listing autism spectrum disorder classifications).

[2] Many of the exhibits filed on ECF contain multiple individual documents. (*See, e.g.*, Doc. No. 37-4 (containing twenty-two distinct documents).) To help identify these documents, the first page of the individual document within each such ECF exhibit is provided.

weekly schedule.  (*See* Classroom Observation (Doc. No. 37-4 at 1) at 1; Class Schedule (Doc. No. 37-4 at 63).)  At Beacon, M.L. was enrolled in a 10-month special class program with a staffing ratio of six students to one teacher and one paraprofessional ("6:1+1") and received full-time 1:1 paraprofessional and related services.  (SRO Decision at 2.)  During the 2011–2012 school year, M.L. also received both home and school-based 1:1 ABA services.  (*Id.* at 2–3.)  According to M.L.'s parents, he attended a special education program at "Camp Chaverim" in July and August 2011, for which they do not seek reimbursement.  (*See* SRO Decision at 4 n.4; Demand for Due Process (Doc. No. 38-6) at 8; Jan. 12, 2012 Tr. (Doc. No. 38-5) at 487–90.)

## II.    M.L.'s IEP and Classroom Assignment

On May 31, 2011, a Committee on Special Education (the "Committee") convened to develop an Individualized Education Plan ("IEP") for M.L. for the 2011–2012 school year.  (IEP (Doc. No. 37 at 2).)  The team consisted of a DOE school psychologist, a district representative/ special education teacher, a DOE social worker, M.L.'s teacher, Beacon's school principal, and the parents, who participated by phone.  (*Id.* at 2.)

The Committee's recommendation included a twelve-month special education program in a special school with a 6:1+1 ratio, 1:1 occupational therapy three times per week for thirty minutes per session, 1:1 speech language therapy three times per week for thirty minutes per session, and 1:2 speech language therapy session once per week for thirty minutes per session. (*Id.* at 1, 7, 9.)  Although it concluded that M.L.'s behavior did not seriously interfere with instruction and could be addressed by his special education classroom teacher, the Committee also developed a behavioral intervention plan ("BIP").  (*Id.* at 4; BIP (Doc. No. 37 at 18).)

On June 9, 2011, the district notified the parents that it had assigned M.L. to a public school.  (SRO Decision at 3.)  M.L.'s father visited the school on June 29, 2011, and notified the

school later that day that he was rejecting the district's placement as inappropriate. (*Id.*) His letter cited the following reasons:

- Classes at the school were based on age, not the performance level of the child, so M.L. could be in a class with students more or less advanced than he was.

- The placement did not provide "sufficient related services."

- The school did not yet know where the classroom would be located.

- The class number listed in the recommendation did not exist.

- The unit coordinator at the school could not guarantee that there would be a spot for M.L. in the upcoming school year.

(Y.L. June 29, 2011 Letter (Doc. No. 37-4 at 41) at 1.) The letter also indicated that M.L. would be attending Camp Chaverim and Beacon "for the 2011–2012 twelve month school year," would continue to receive services from the Yeled Vyalda program, and indicated that M.L.'s father would seek funding or reimbursement for thirty hours per week of SEIT, one hour per week for an SEIT supervisor, five hours per week of speech therapy, three thirty-minute sessions per week of occupational therapy, and transportation to and from the school. (*Id.* at 1–2.)

On September 1, 2011, the parents signed a "letter of agreement" with Beacon covering the 2011–2012 school year. (SRO Decision at 3.) The agreement specified tuition of $35,000 for the school year, plus an additional charge of $24,000 for "one-to-one social/behavioral intervention." (Letter of Agreement (Doc. No. 37-4 at 55).) The parents paid $10,000 towards this amount. (SRO Decision at 3.) The parents also entered into an agreement with M.L.'s former pre-school to provide ABA services for the school year. (*Id.*) On September 12, 2011, M.L. began the school year at Beacon. (*Id.*)

### III.    Impartial Hearing Officer ("IHO") Review

## A. Due Process Complaint

On July 19, 2011, the parents filed a due process complaint. (*Id.*; Demand for Due

Process.) The complaint asserted seventy-one allegations, including:

> The May 2011 [Committee] "failed to meaningfully include [M.L's parents] in
> the IEP development and placement selection process" and "impermissibly
> abdicated the school 'placement' decision to an inadequately informed
> administrator who was not even present at [the May 2011 Committee] meeting" . .
> . [T]he May 2011 IEP was not reasonably calculated to provide the student with a
> FAPE, insofar as it lacked a transition plan addressing the student's transition
> from an ABA-based program at Beacon to the district's recommended program,
> which employed the Treatment and Education of Autistic and related
> Communication Handicapped Children (TEACCH) methodology, that the IEP did
> not include parent counseling and training services, and that the functional
> behavioral assessment (FBA) and BIP developed by the district were inadequate. .
> . . [T]he assigned school was inappropriate for the student because: it did not
> offer the "intensive, cohesive, and properly supervised 1:1 instruction and
> behavioral support" that the student required; the class composition and staff in
> the assigned 6:1+1 special class would have changed from summer 2011 to
> September 2011; the student would have been inappropriately grouped in the
> assigned 6:1+1 special class; the district failed to evaluate whether the TEACCH
> methodology utilized in the assigned 6:1+1 special class was appropriate to
> address the student's needs; and that TEACCH was, in fact, inappropriate for the
> student.

(SRO Decision at 4 (internal citations omitted).) The due process complaint sought

reimbursement for tuition, costs, and services at Camp Chaverim for July and August of 2011

and at Beacon for September 2011 through July 2012, and compensatory education for any

services that the DOE failed to provide during the pendency of M.L.'s hearing. (*Id.*)

## B. IHO Hearing & Decision

The Impartial Hearing Officer convened a hearing on August 24, 2011. (IHO Findings of

Fact & Decision (Doc. No. 36-2) at 3.) The hearing concluded after six non-consecutive days of

proceedings, and on February 29, 2012 the IHO issued her decision. (SRO Decision at 4.) The

IHO found that the Committee was duly constituted, that it considered appropriate information

necessary to assess M.L.'s present levels of performance and to develop his IEP, and that the

annual and short-term goals specified in the IEP were adequate, notwithstanding the lack of a written transition plan, the lack of an identified school placement, and the omission of parent counseling and training services. (*Id.* at 5.)

With respect to M.L.'s actual classroom assignment, the IHO noted that the district was only required to have an appropriate program in place by the first day of the school year, and because the parents rejected the proposed public school classroom before that date, limited her analysis to the extended school year program offered by the district for the summer of 2011, and determined that he was appropriately grouped. (*Id.*) The IHO further found that the methodology of the assigned special class, which used the Treatment and Education of Autistic and related Communication Handicapped Children ("TEACCH") methodology, discrete trial ABA, and a multisensory approach, was appropriate. (*Id.*) Based on all these findings, the IHO determined that the district had offered M.L. a FAPE. (*Id.*)

The IHO then went on to make two alternative findings that independently would have merited rejecting reimbursement for the 2011–2012 school year. First, the IHO found that the parents had not met their burden of demonstrating that Beacon was an appropriate placement.[3] (*Id.*) Second, the IHO concluded that even if the parents had shown that Beacon was an appropriate placement, equitable considerations favored denial of reimbursement because the record indicated the parents were unwilling to consider a public school placement. (*Id.*)

---

[3] The IHO based her conclusion on the following: (i) Beacon offered only a ten-month special education program, while the IEP called for a twelve-month program; (ii) the evidence adduced at the hearing showed that M.L. regressed during the summer at Camp Chaverim; (iii) the hearing record lacked evidence sufficient to demonstrate how Beacon's programs met M.L.'s individual needs; (iv) M.L.'s difficulties persisted while at Beacon; and (v) the parents offered no objective, measurable evidence indicating whether M.L. progressed while enrolled at Beacon. (SRO Decision at 4.)

## IV.    SRO Review

On April 2, 2012, M.L's parents appealed the IHO's decision to the SRO.  (Verified Petition (Doc. No. 36-4).)  In a lengthly decision dated January 18, 2013, the SRO dismissed the appeal.[4]  (SRO Decision.)  The SRO concluded that the IEP was reasonably calculated to provide M.L. with educational benefits and that the district had therefore offered M.L. a FAPE for the 2011–2012 school year.  (SRO Decision at 29.)  Alternatively, the SRO found that the parents had failed to demonstrate that their unilateral placement of M.L. at Beacon was appropriate.  (*Id.* at 29–30.)  Concluding that both of these grounds independently warranted denial of the parents' appeal, the SRO declined to address whether equitable considerations weighed in favor of the parents or the district.  (*Id.* at 30.)

## V.    The Instant Action

The parents appealed the SRO's decision on April 17, 2013.  They seek (i) modified *de novo* review and reversal of the SRO's decision and (ii) reimbursement for attorneys' fees recorded at the administrative level.  (Compl. (Doc. No. 1 at 1) at ¶ 23.)  The parents' complaint asserts that M.L.'s IEP was inadequate because (i) [the DOE] failed to conduct a proper and adequate Functional Behavior Assessment ("FBA"); (ii) the IEP made no provision for "parent training;" (iii) the IEP made no provision for a supporting paraprofessional or other 1:1 support; and (iv) the meeting at which the IEP was developed did not include any discussion of school sites and the parents were not otherwise given the opportunity to provide input into that decision.  (Compl. at ¶¶ 8–11.)  Although not specifically identified in their complaint, the parents' memorandum of law in support of summary judgment alludes to several additional objections,

---

[4] The SRO acknowledged that the decision was rendered 219 days late, including a letter indicating this fact along with his decision and adding a copy of the letter to the administrative record.  (SRO Jan. 18, 2013 Letter (Doc. No. 1 at 39).)

including the lack of any transition plan in M.L.'s IEP, the range of functional student abilities in the proposed classroom, and the teaching methodology employed by M.L.'s prospective teacher. (*See* Parents' Mem. Law (Doc. No. 25) at 2–5.) [5]

In this case, the Court is mindful of plaintiffs' *pro se*, status, and construes plaintiffs arguments to raise the strongest case possible.

## LEGAL STANDARDS

### I. The IDEA

#### A. Requirement to Provide a FAPE

States like New York that receive federal funding under the IDEA must develop plans to ensure that all children with disabilities have access to a FAPE. 20 U.S.C. §§ 1412(a), 1415. A FAPE must include special education and related services tailored to meet each child's unique needs and be "reasonably calculated to enable the child to receive educational benefits." 20 U.S.C. § 1401(9); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982)). For an IEP to be adequate, it must be likely to produce progress rather than regression and afford the student "an opportunity greater than mere trivial advancement." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted). The IDEA, however, does not require the IEP to furnish every special service necessary to maximize each child's potential. *Id.*

Accordingly, the DOE must, at least annually, set forth each student's particular needs and the services required to meet those needs in an IEP that includes: (i) the student's present levels of academic achievement and functional performance; (ii) annual goals, including short-

---

[5] In this case, the Court is mindful of plaintiffs' *pro se*, status, and construes plaintiffs' papers to raise the strongest arguments possible.

term instructional objectives; (iii) a description of how and when the student's progress toward these annual goals will be measured; (iv) the special education, related services, and supplementary aids, and devices the student will receive; (v) the extent to which the student will be able to participate in a regular educational program; (vi) the proposed services' projected initiation date and duration; and (vii) objective criteria, evaluation procedures, and schedules for determining whether the student is achieving the student's instructional objectives. 20 U.S.C. § 1414(d).

Analysis of whether an IEP complies with the IDEA follows a two-part inquiry. First, the court must determine whether the state has complied with the procedural requirements of the IDEA. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189–90 (2d Cir. 2012). Then, the court must assess the substantive adequacy of the IEP – that is, whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *See Walczak*, 142 F.3d at 122. "The initial procedural inquiry is no mere formality." *Id.* at 129. However, not every "procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). An IEP is deemed legally inadequate based on a procedural error only when the procedural error "impeded the child's right to a [FAPE], significantly impeded the parents' opportunity to participate in the decision making process, or caused a deprivation of educational benefits." *R.E.*, 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii); *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009)) (alteration in original) (internal quotation marks omitted).

### B. Burden of Proof

The Second Circuit has held that where, as here, plaintiffs seek judicial review of an SRO's determination that an IEP was proper, the plaintiffs bear the burden of proof. *See M.H.*, 685 F.3d at 225 n.3 ("Because the State Review Officers in the cases at bar concluded that the IEPs were proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officers erred is properly understood to fall on the plaintiffs."). Accordingly, plaintiffs bear the burden of proof before the Court.

### C. Private School Tuition Reimbursement

Under certain conditions, the IDEA requires school authorities to reimburse parents who unilaterally place their children in private schools. *Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1996). Pursuant to *Burlington*, a school district may be required to pay for educational services obtained for a child by the child's parents if: (i) the services offered by the board of education were inadequate or inappropriate; (ii) the services selected by the parents were appropriate; and (iii) equitable considerations support the parents' claim. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005); *M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers*, 231 F.3d 96, 102 (2d Cir. 2000).

## II.     District Court Review

A summary judgment motion in an IDEA case "serves as a pragmatic procedural mechanism for reviewing" a prior administrative determination. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted); *see also id.* ("[IDEA summary judgment motions are] in substance an appeal from an administrative determination, not summary judgment." (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court's standard of review is a "modified *de novo* review" of the administrative proceedings based upon the preponderance of the evidence. *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 103 (E.D.N.Y. 2011). The Supreme Court has explained that this review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these [administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (internal quotation marks omitted); *see also Grim*, 346 F.3d at 383 (stating that district courts should not choose between conflicting expert views on controversial issues of educational policy). Deference is therefore appropriate where the administrative reviews were thorough and careful. *Id.*; *accord M.H. v. N.Y.C. Dep't of Educ.*, No. 09-CV-3657 (LAP), 2010 WL 1904005, at *17 (S.D.N.Y. May 10, 2010), *aff'd*, *M.H.*, 685 F.3d at 258. Even where the SRO disagreed with the IHO, courts "generally defer to the final decision of the state authorities." *M.H.*, 685 F.3d at 241 (internal quotation marks omitted).

However, the level of deference the Court should extend depends on the quality of the SRO's opinion, taking into account the factors that normally determine whether any particular judgment is persuasive, but bearing in mind "the statutory context and the administrative judges' greater institutional competence on matters of educational policy." *R.E.*, 694 F.3d at 189. Accordingly, an SRO's determination regarding an IEP's substantive adequacy should receive more deference than his determination concerning whether the DOE developed the IEP using proper procedures. *Id.* (citing *M.H.*, 685 F.3d at 244). Likewise, an SRO's determination in a

dispute regarding educational methodology should receive more deference than his determination concerning whether there are objective indications of progress. *Id.* Further, if a court concludes that the SRO's analysis is "insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court . . . to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.* (quoting *M.H.*, 685 F.3d at 246).[6]

## DISCUSSION

The parents do not designate their claims as either procedural or substantive, and courts in the Second Circuit have varied in their treatments of similar claims.[7] Here, the Court will consider as procedural the following allegations, which concern the sufficiency of the procedures the DOE followed in developing M.L.'s IEP: (i) the DOE failed to conduct a proper and adequate FBA, as required for the development of an IEP, (Compl. at ¶ 8); and (ii) the DOE did not engage in any discussion of school sites at M.L.'s IEP meeting, (Compl. at ¶ 11). In contrast, the Court will view as substantive the following allegations, which concern the appropriateness of the program offered to M.L.: (i) the IEP makes no provision for "parent training," (Compl. at ¶ 9); (ii) the IEP lacks a transition plan, (Parents' Mem. Law at 2); (iii) the IEP fails to make provisions for supporting paraprofessional or other 1:1 support, (Compl. at ¶ 10); and (iv) the

---

[6] In the complaint, the parents suggest that this Court should give little or no deference "whatsoever" to the SRO's decision. (Compl. at ¶ 19.) However, their memorandum of law in support of summary judgment seeks "modified *de novo* review." (Parents' Mem. Law (Doc. No. 25) at 1.) The parents' apparent argument for a less deferential review is centered on the considerable lateness of the SRO's decision. (*See* Parents' Mem. Law at 1; Compl. at ¶ 19.) Although the parents assert that "the SRO didn't review the case to the fullest because [he] was behind schedule," and is less credible in considering whether the DOE violated the rules because he himself violated the time requirement, (Parents' Mem. Law at 1), these assertions are without support and contradicted by the length and thoroughness of the SRO's decision. For the reasons stated above, the Court applies modified *de novo* review, the standard of review set forth in both the parents' and the DOE's memoranda of law.

[7] *Compare e.g.*, *A.C. ex rel. M.C.*, 553 F.3d at 172 (treating claim for failure to conduct an FBA as asserting a procedural violation), *and R.E.*, 694 F.3d at 193 (treating district's failure to provide parent counseling as a procedural violation), *with M.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 510 (S.D.N.Y. 2008) (deeming DOE's failure to conduct an FBA to be a substantive violation), *and T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418–19 (2d Cir. 2009) (treating claim for failure to include parent training as asserting a substantive violation).

teaching methodology employed in and the composition of the district's proposed classroom were inadequate, (Parents' Mem. Law at 4).

## I.     Procedural Claims

Compliance with IDEA procedures is critical to ensure that DOE meets a student's special educational needs. *See Rowley*, 458 U.S. at 206.  However, not every procedural error in developing an IEP renders the IEP legally inadequate. *Grim*, 346 F.3d at 381.  A procedural error renders an IEP invalid only if the error "depriv[es] a student of his right to a [FAPE]." *Id.*; *see also E.H. ex rel. C.H. v. Bd. of Educ. of Shenendehowa Central Sch. Dist.*, No. 05 CV 927, 2008 WL 3930028, at *7 (N.D.N.Y. Aug. 21, 2008) ("[T]here must be some evidence that procedural defects compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."), *aff'd*, 361 F. App'x 156 (2d Cir. 2009).  The Circuit has emphasized, however, that "even minor violations may cumulatively result in a denial of a FAPE." *R.E.*, 694 F.3d at 191.

### A.  Failure to Conduct a Proper and Adequate FBA

The New York state regulations giving effect to the IDEA require that the DOE conduct an FBA in situations where a student's behavior impedes the student's learning or that of others. *R.E.*, 694 F.3d at 194 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(b)(1)(v)).  Although the Committee determined that M.L.'s behavior "did not seriously interfere with instruction," it nonetheless developed an FBA.  (*See* SRO Decision at 3.)  For purposes of this decision, the Court will assume that an FBA was required.  The parents, however, assert that the Committee created an FBA that was improper and inadequate, focusing on the facts that: (i) the DOE did not conduct any independent evaluations or assessments, aside from what they describe as "one brief

*observation*" by an individual who did not participate in the IEP meeting; (ii) the FBA instead relied heavily upon information provided by Beacon; and (iii) the FBA did not incorporate data on the frequency, duration, or intensity of M.L.'s behaviors. (Parents' Mem. Law at 2.) None of the alleged inadequacies denied M.L. a FAPE.

As to the parents' first two objections, the Committee considered a sufficiently broad and appropriate range of sources in developing M.L.'s FBA. New York state regulations require that FBAs be based upon multiple sources of data and not solely on the student's history of presenting problem behaviors. *See* 8 N.Y. Comp. Codes, R. & Regs. 200.22(a)(2). To that end, the regulations contain a non-exhaustive list of appropriate sources of information to be considered in development of the IEP, including "information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent." *Id.* The school psychologist who drafted M.L.'s FBA at the Committee meeting relied not only on the aforementioned classroom observation, conducted on February 9, 2011, but also upon information provided by M.L.'s teachers and principal, a speech therapist, and an occupational therapist from Beacon, as well as a comprehensive psychological evaluation conducted on two non-consecutive days in March 2011. (*See* Nov. 3, 2011 Tr. (Doc. No. 38-1) at 50.) Notably, the regulations do not require that the DOE conduct evaluations independent of those conducted by the student's school, and the Committee relied on each of the sources specifically identified in Regulation 200.22(a)(2) in developing M.L.'s FBA, with the exception of "information from the student."

The parents also assert that the FBA is deficient insofar as it does not contain data concerning frequency, duration, or intensity of M.L.'s interfering behaviors. As the parents correctly suggest, an FBA must establish a baseline "with regard to frequency, duration, intensity and/or latency across activities, settings, people and times of the day" sufficient to develop a BIP that "addresses antecedent behaviors, reinforcing consequences of the behavior, recommendations for teaching alternative skills or behaviors and an assessment of student preferences for reinforcement." 8 N.Y. Comp. Codes, R. & Regs. 200.22(a)(3). Even complete failure to conduct an FBA, however, while unquestionably a procedural violation, does not amount to a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it. *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013).

In this case, M.L.'s FBA identifies significant background and immediate antecedents to his behaviors, the context in which such behaviors occur, and the nature, consequences, and functions of such behaviors. (*See* FBA (Doc. No. 37 at 21).) The resulting BIP addresses more than half a dozen specific interfering behaviors, provides specific goals and strategies for behavioral improvements, and specifies supports to help M.L. change his behaviors. (BIP (Doc. No. 37-4 at 37).) The SRO's decision acknowledged that the Committee's failure to quantify the frequency and duration of M.L's behaviors was a procedural violation. (SRO Decision at 20.) However, after carefully and thoroughly considering the adequacy of the FBA and BIP in light of these violations, the SRO concluded that they did not substantively harm M.L. or result in the denial of a FAPE. (*Id.* at 20–21.) As discussed below, upon modified *de novo* review, the Court agrees, finding that the program developed by the DOE was substantively adequate, notwithstanding any technical violations in the development of M.L.'s FBA.

**B. Failure to Discuss School Sites at M.L.'s IEP Meeting or to Otherwise Consult M.L's Parents Regarding School Site**

The parents complain that the Committee did not discuss specific schools at the IEP meeting and did not involve the parents in "the placement decision." (Compl. at ¶ 11.) They appear to be referring to the requirement that parents be permitted to participate either in meetings concerning the "educational placement" of the child, or in the creation of the IEP, which includes the "location" of services to be provided. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VII) (defining IEP to include the "location" of services to be provided); 34 C.F.R. § 300.501(b)(1)(i) (including requirement of parental input on "educational placement"). Regardless of which requirement they intended to invoke, however, their complaint misconstrues what the law requires. "Educational placement," as it is used in the regulations "refers only to the general type of educational program in which the child is placed." *T.Y.*, 584 F.3d at 419 (quoting *Concerned Parents v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 756 (2d Cir. 1980)). "Location" similarly does not refer to the particular facility, but merely "the general setting in which the services will be provided." *Id.*

The parents participated in the IEP meeting by phone. The SRO found, and the record reflects, that the parents were afforded the opportunity to ask questions and voice concerns at this meeting. (SRO Decision at 11–12 (citing Nov. 3, 2011 Tr. at 57–58, 73–74, 83; Jan. 12, 2012 Tr. at 473–74, 501–02).) Although the parents object to components of M.L.'s IEP, most notably the absence of a provision for a full-time 1:1 paraprofessional, they clearly participated in the decision making regarding the "general type of educational program" and "educational placement" offered to M.L. (*See id.*) Moreover, the parents have not objected to "the general setting" called for in M.L.'s IEP – in this case, a 6:1+1 special education classroom. Thus, the

DOE provided the parents sufficient input into the location of services to be provided to M.L. and into his educational placement for the 2011–2012 school year.

## II.    Substantive Claims

Turning next to the parents' substantive claims, the Court finds them to be without merit. As a threshold matter, applying modified *de novo* review, the Court concurs with the conclusion of the SRO and IHO that M.L.'s IEP was "reasonably calculated to enable [M.L.] to receive educational benefits." *See* 20 U.S.C. § 1401(9); *Walczak*, 142 F.3d at 122. As required, the IEP identified M.L.'s present levels of academic achievement and functional performance, including an evaluation of M.L.'s social/emotional performance and health and physical development factors. (IEP at 3–5.) The IEP sets forth achievable, measurable annual goals, as well as short-term instructional objectives, specifies how those goals will be measured, and indicates that M.L.'s progress will be evaluated through four progress reports over the course of the school year. (IEP at 6-A–6-D). Finally, the IEP recommends a twelve-month special education class in a special school with a 6:1+1 ratio and related services for the 2011–2012 school year. (*Id.* at 1, 7, 9.)

As discussed above, the DOE also produced a BIP that addressed more than half a dozen specific interfering behaviors, provided specific goals and strategies for behavioral improvements, and specified supports to help M.L. change his behaviors. In sum, M.L.'s IEP was more likely to produce progress than regression and offered an opportunity greater than mere trivial advancement, and was therefore adequate. *See Walczak*, 142 F.3d at 130; *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d at 224. As discussed below, none of the substantive violations alleged by M.L.'s parents undermine this conclusion.

## A.  Failure to Include a Provision for "Parent Training" in M.L.'s IEP

M.L.'s IEP makes no provision for parent counseling and training, and parent training was not even discussed at M.L's IEP meeting.  The DOE does not dispute these facts, and also concedes that such a provision is required by state regulation.  (DOE Mem. Law (Doc. No. 30) at 22); *see also* 8 N.Y. Comp. Codes, R. & Regs. 200.13.  However, in contrast to more serious violations, a failure to include required parent training or counseling will not ordinarily by itself warrant reimbursement, because the omission can be easily rectified at a later date.[8]  *See R.E.*, 694 F.3d at 190–91 (comparing failure to conduct an FBA, which impedes development of the IEP, to failure to provide parent counseling and training).

The SRO acknowledged that the Committee failed to recommend any parent counseling or training as required by state regulations.  He concluded, however, that the record did not contain any evidence showing that this defect, on its own, "rose to the level of denying [M.L.] a FAPE."  (SRO Decision at 14.)  Based on modified *de novo* review, the Court finds that the SRO's conclusion is amply supported by the record and that the DOE's failure to include parent training in M.L.'s IEP did not result in the denial of a FAPE.

## B.  Failure to Include a Transition Plan

The parents argue that the DOE's failure to include a transition plan in M.L.'s IEP resulted in denial of a FAPE.  (Parents' Mem. Law at 2 ("The DOE . . . acknowledged that M.L. has trouble with transitions. . . .  All of these changes required a 'plan' to help M.L. transition and the DOE had <u>no</u> plan at all.").)  The parents do not identify a legal basis for their insistence that the DOE was required to provide M.L. with a transition plan, nor could they, because there is no such requirement under the IDEA.  *A.L. v. N.Y.C. Dep't of Educ.*, 812 F. Supp. 2d 492, 505

---

[8] The parents have neither requested parent counseling and training, nor sought reimbursement for such services. Although the Court concludes that the omission of parent counseling or training in this case did not amount to denial of a FAPE, it does not address what, if any, counseling or training services they may still be entitled to.

(S.D.N.Y. 2011) ("[T]here is no requirement that an IEP specify a transition plan for a student attending a new school placement."); *see also F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-5131 (RKE), 2012 WL 4891748, at *9 (S.D.N.Y. Oct. 16, 2012) *aff'd*, 553 F. App'x 2 (2d Cir. 2014) (noting absence from statute of any entitlement to a transition plan in a student's IEP).

The parents appear to misconstrue one of two inapplicable legal requirements regarding transition services. First, the IDEA requires "transition services" not when a child transfers between schools, but when a child transitions "from school to post-school activities, including post-secondary education, vocational, education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community population." 20 U.S.C. § 1401(34).[9] Second, New York state regulations giving effect to the IDEA require a school district to provide "transitional support services," when a student with autism has been placed into a program "containing students with other disabilities, or in a regular class placement." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(6). These services are provided to the teacher, not the student, in such cases. *Id.* § 200.1(ddd). The regulation is inapplicable because the classroom that the DOE proposed for M.L. included five other students, all of whom had been diagnosed with autism. (Nov. 9, 2011 Tr. (Doc. No. 38-2) at 147.) Although the composition of M.L.'s class would likely have changed in September 2011, (*id.* at 182), and although the final September classroom at the public school had yet to be determined, (*id.* at 150–51), the designation of the class as "Y17" indicated that M.L. would be assigned to a class also designated for students with autism. (*See id.* at 68.)

---

[9] Moreover, the IDEA only requires the provision of such services starting with the first IEP that will be in effect when the student reaches the age of sixteen. *See* 20 U.S.C. § 1414(d)(l)(A)(viii).; N.Y. Educ. Law § 4401(9). M.L. turned nine years old during the 2011–2012 school year. (*See* IEP at 1.)

### C. Failure to Include Any Provision for Supporting Paraprofessional or Other 1:1 Support in M.L.'s IEP

The parents allege that despite M.L. engaging in dangerous behaviors and lacking basic safety awareness, the IEP contains no provision for a paraprofessional or any other 1:1 support. (Compl. at ¶ 10.)  But M.L.'s IEP specifically recommended, in addition to other services, 1:1 occupational therapy three times per week and 1:1 speech language therapy three times per week.  What the IEP does not provide for, and what M.L. received at Beacon, is 1:1 "social/ behavioral intervention" services.  (*See* Letter of Agreement.)

"A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential.'"  *Cerra*, 427 F.3d at 195 (quoting *Rowley*, 458 U.S. at 199).  Rather, the IEP need only be "reasonably calculated to enable the child to receive educational benefits."  *Id.* at 194 (quoting *Rowley*, 458 U.S. at 207).  Moreover, "[t]he IDEA does not permit parents to challenge an IEP on the grounds that it is not the best or most desirable program for their child."  *L.K. v. Dep't of Educ. of New York*, No. 09-CV-2266 (RRM) (LB), 2011 WL 127063, at *11 (E.D.N.Y. Jan. 13, 2011) (quoting *M.M. v. Sch. Bd. of Miami–Dade Cnty.*, 427 F.3d 1085 (11th Cir. 2006) (alterations omitted).)

Here, both the IHO and the SRO considered the level of behavioral interventions offered in M.L.'s IEP and concluded that the district had provided M.L. with a FAPE.  (SRO Decision at 20; IHO Findings of Fact & Decision at 22.)  Their reviews were thorough and careful, relying on testimony from the DOE's school psychologist concerning the factors considered in developing M.L.'s IEP and testimony from the assigned classroom teacher indicating that she was capable of implementing the IEP.  (*See* SRO Decision at 20, 24–25; IHO Findings of Fact & Decision at 22; *see also* Nov. 3, 2011 Tr. at 72–73; Nov. 9, 2011 Tr. at 165–72 (discussing strategies for dealing with harmful behaviors).)  Based on modified *de novo* review of the record,

and deferring to the thorough and well-reasoned conclusions of the administrative officers as a matter of educational policy on the sufficiency of particular educational provisions as they apply to the individual student, in this case M.L., the Court concludes that the absence of a provision for a dedicated 1:1 paraprofessional did not result in the denial of a FAPE.

### D. The Adequacy of the TEACCH Methodology and the Composition of the Proposed Classroom

In addition to their claims concerning the content of the IEP, the parents raise several concerns regarding M.L.'s proposed classroom assignment. Specifically, they object to the teacher's use of the TEACCH methodology[10] and the functional grouping of M.L.'s classmates. (Parents' Mem. Law at 4–5.) Their claims are without merit.

The district was not required to consider any particular teaching methodology in the development of M.L.'s IEP, and M.L.'s IEP does not specify one. *See F.L.*, 2012 WL 4891748 at *9. Moreover, while a school district's failure to properly implement an IEP may result in the denial of a FAPE, *see A.P. v. Woodstock Bd. of Educ.*, 370 Fed. App'x. 202, 205 (2d Cir. 2010), the DOE need only be prepared to implement the IEP by the first day of school, *see S.M. v. Taconic Hills Cent. Sch. Dist.*, 553 Fed. App'x. 65, 66 (2d Cir. 2014). "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195. By rejecting the IEP in advance of the first day of the school year, any question as to whether the school district would have been prepared to implement the IEP is exactly that – speculation. Although it may be appropriate to consider a prospective classroom assignment where the school's inability to implement the IEP is "reasonably apparent" at the time of rejection, *see E.A.M. v. N.Y.C. Dep't of Educ.*, 11-CV-3730 (LAP), 2012 WL

<hr />

[10] The district was not required to consider any particular teaching methodology in the development of M.L.'s IEP, and M.L.'s IEP does not specify one. *See F.L.*, 2012 WL 4891748 at *9.

4571794, at *11 (S.D.N.Y. Sept. 29, 2012), here, the parents have not identified any elements of the IEP that the proposed school could not implement.

Furthermore, modified *de novo* review of the record fully supports the SRO's independent findings as to whether the proposed public school classroom would have satisfied the requirements of the IEP. The SRO found that the school district's proposed classroom would not have deviated from M.L.'s IEP in any material way. (*See* SRO Decision at 22.) In doing so, the SRO considered possible changes to the composition, staff, and location of the classroom from summer to fall, the 1:1 instructional and behavioral supports provided to students in the class, the range of instructional function levels of the students, and the methodology employed by the class's teacher. (*Id.* at 21–27.) The Court concludes that to the extent the school's ability to implement the IEP was apparent at the time of the parents' rejection, the SRO's analysis is well-reasoned, fully supported by the record, and worthy of deference. *See R.E.*, 694 F.3d at 189.

## CONCLUSION

For the reasons set forth herein, defendant's motion for judgment on the pleadings is granted, and plaintiffs' motion for judgment on the pleadings is denied. The Clerk of Court is respectfully directed to enter judgment accordingly, mail copies of this Memorandum and Order and the accompanying Judgment to plaintiffs, and to close this case.

SO ORDERED.

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

Dated: Brooklyn, New York
      March 27, 2015